**CMAX/CLEVELAND, INC. d/b/a Computermax, Plaintiff,**

v.

**UCR, INC., a Georgia corporation, David T. Cherry, L & B Rents, Inc., a California corporation, South Carolina Rentals, Inc., d/b/a Ace TV, a Georgia corporation, and James T. Archer, Defendants.**

**Civ. No. 91–75–ATH(DF).**

United States District Court,
M.D. Georgia,
Athens Division.

Sept. 25, 1992.

**340**

Stephen M. Dorvee, Frank N. White, Atlanta, Ga., for Computermax, Inc.

Dan A. Aldridge, Jr., Atlanta, Ga., for UCR, Inc., David T. Cherry, L & B Rents, Inc., South Carolina Rentals, Inc., James S. Archer, and U Can Rent, Inc.

FITZPATRICK, District Judge.

Plaintiff filed suit against Defendants for copyright infringement, misappropriation of trade secrets, and breach of contract. The case was tried by this Court sitting without a jury on December 12–13, 1991.

### FINDINGS OF FACT

1. UCR is a Georgia corporation formed in October 1987, which was engaged in the rent-to-own business. UCR rented televisions, stereos, video cassette recorders and other consumer audio/visual products, furniture and household appliances to the general public.

2. Computermax is a computer software company located in Cleveland, Tennessee. It is the creator and licensor of a computer software system called RMAX (hereinafter "RMAX System"), designed for use by companies engaged in the rent-to-own business. The RMAX System enables companies to input, store, process and retrieve information incident to the "rent-to-own" furniture and appliance business, including inventory, rental agreement and accounting information.

3. The RMAX System is comprised of two related component software "packages," the RMAX Remote Store System and the RMAX Host System.

4. The RMAX Remote Store System controls the operations of individual rental store locations. This "remote" component of the RMAX System permits input, on an individual rent to own store's daily activity, including rental agreement and receipt processing, inventory control and transfers, purchasing requests and electronic mail to user rental company's home office computer.

5. The RMAX Host System permits the management of the rent-to-own company to monitor the daily and periodic activity in all its remote stores. This "host" or "home office" component of the RMAX system collects each day's activities during unattended, nightly data transmissions from each store location, tracks inventory, rental agreements and other data at each store, and compiles a detailed database from which management can elicit reports and control remote store operations.

6. Computermax has developed and refined the RMAX system over a period of approximately nine years.

7. The RMAX System provides its users with a comprehensive software package

that facilitates the efficient, informed operation of every aspect of the rent-to-own business. The RMAX System is distinct from the software packages offered by Computermax's competitors because it runs in the Pick operating system, which allows for the development of a more flexible system that is extremely file-oriented. This difference gives Computermax a significant competitive advantage.

8. Generally, an RMAX system licensee pays Computermax licensee fees beginning at $3,000 per retail store location for the RMAX Remote Store System (which may decrease as the number of the licensee's retail stores increases) and fees beginning at $15,000.00 to $25,000.00 for the RMAX Host System (which may increase to as much as $70,000.00 as the size of the licensee's host computer and number of "options" purchased increase). (Plaintiff's Exhibit 25). Computermax derives most of its revenues from the licensing and maintenance of the RMAX System, its accompanying hardware and supplemental software packages.

9. The RMAX System is protected under the United States Copyright Act as an unpublished work containing trade secrets pursuant to Copyright Registration Nos. TXU 460 055 (RMAX Remote Store System, Version 1.0), TXU 460 054 (RMAX Remote Store System Version 2.0), TXU 460 051 (RMAX Remote Store System 2.0, Revision 28), TXU 460 053 (RMAX Host System, Version 1.0), TXU 460 056 (RMAX Host System, Version 2.0), TXU 460 052 (RMAX Host System, Version 2.0, Revision 28), effective April 12, 1991. (Plaintiff's Exs. 3–11). Computermax owns all these computer copyrights, which cover the entire RMAX System, as well as every version of the RMAX system, involved in this action.

10. Computermax goes to great lengths to maintain the confidentiality of the RMAX System. The source code (Plaintiff's Exs. 1–2, 27), menu screens (Plaintiff's Ex. 26) and documentation (Plaintiff's Exs. 17–18) of the RMAX System feature a confidentiality and copyright notice. Moreover, Computermax licenses the RMAX System to users under license agreements that strictly prohibit its disclosure to third parties. Normally, Computermax does not provide RMAX System source code to licensees unless the licensee requests it for a good reason. Computermax, requires its employees to sign confidentiality agreements, and its programmers are required to shred any printouts of source code that they produce for any reason.

## THE UCR LICENSE

11. On or about September 28, 1987, Computermax and the predecessor in interest of Defendant UCR, Inc. ("UCR") signed license agreements whereby Computermax granted UCR licenses to use the RMAX Remote Store System and the RMAX Host System (collectively "the License Agreement"). The RMAX Host System license covered a single copy of the software on a single computer at UCR's home office. (Plaintiff's Ex. 12.) The RMAX Remote Store System license covered the software installed at each UCR remote store. The RMAX Remote Store System license, however, was not issued to a particular store location. Rather, it covered a total number of stores being operated by Archer. The parties agreed that UCR would pay Computermax additional remote store license fees as additional stores came on line if the original number licensed was exceeded. (Plaintiff's Ex. 13.) For example, if ten (10) Archer-owned stores closed down and ten (10) opened up no additional license fee was required because there would be no net change in the number of Archer-owned stores using the RMAX Remote Store System.

12. UCR was engaged in the rent-to-own business from a number of retail-type rent-to-own store locations throughout the United States. All the stores operated under the name "U Can Rent."

13. The License Agreement provided that full ownership rights in the RMAX System remained solely with Computermax.

14. The License Agreement also provided that UCR recognized Computermax's proprietary rights in the RMAX system

and agreed not to reproduce any portion of the RMAX system by any means or for any purpose whatsoever, except normal back-up.

15. UCR also agreed to take all reasonable steps necessary to ensure that the RMAX System was not made available to anyone not subject to the license agreement, and that UCR was not to resell, rent, lease or trade the RMAX System. Furthermore, UCR was not to assign any of its rights without the written consent of Computermax.

16. Finally, the License Agreement provided that Computermax retained the right to access UCR's RMAX Host System to ascertain whether the RMAX System was being utilized by any unlicensed "U Can Rent" store locations. Computermax routinely conducted such audits.

### The Relationship Between Computermax and UCR

17. After executing the License Agreement, UCR obtained and began using the RMAX System. The RMAX Host System was installed in the computer at UCR's home office in Bogart, Georgia, and the RMAX Remote Store System was placed in UCR's retail stores.

18. Thereafter, Computermax also provided UCR with hardware and software modifications, training services and telephone support on an as-needed basis.

19. In a letter dated September 21, 1988 (Plaintiff's Ex. 24), Computermax also provided UCR with the source code for all basic programs in the RMAX System. Mr. Wilhelm testified that UCR requested the source code in order to better communicate problems to and request improvements from Computermax.

20. Defendant David T. Cherry, the Chief Information Officer of UCR, was primarily responsible for overseeing UCR's day-to-day use of the RMAX System. Cherry was also the primary person who communicated with Computermax when problems with the RMAX System arose or when UCR requested special features from Computermax.

21. Cherry became familiar with all aspects of the RMAX System and had continuous access to its source code.

22. UCR expanded rapidly, both by opening additional stores, and, primarily, by acquiring stores operated by other rent-to-own companies and converting them to "U Can Rent" stores. In the course of this rapid expansion, and to simplify the necessary financing, UCR's principal, Defendant James Archer, routinely formed various additional corporations to acquire groups of rent-to-own stores. Archer formed Galleria Home Centers, Inc., First Choice Rentals, Inc., Classic Rentals, Inc. and Archer Capital, Inc. for this purpose. All of the corporations were affiliated with UCR, did business out of UCR's Bogart, Georgia home office and operated rent-to-own stores under the "U Can Rent" name.

23. At its peak, UCR and its affiliated stores operated over 200 "U Can Rent" store locations, all of which operated on the RMAX Remote Store System and transmitted data on a nightly basis to a single RMAX Host System for processing and reporting.

24. Under the License Agreement, UCR was obligated to pay a license fee of $1,500.00 per additional store to Computermax. Computermax and UCR had negotiated this discounted price down from the usual, $3,000.00 price on the grounds that UCR anticipated purchasing a large number of RMAX Remote Store System licenses in a relatively short period of time. UCR often failed, however, to report the addition of new "U Can Rent" store locations using the RMAX Remote Store System to Computermax. Mr. Wilhelm, however, testified that he did not know whether UCR ever exceeded the total number of stores originally licensed for the RMAX Remote Store System.

25. Eventually, tensions began to strain the relationship between Computermax and UCR. David Cherry and other officers at UCR thought that the RMAX System was too costly since UCR was required to purchase an additional RMAX Remote Store license from Computermax, that RMAX System was expensive to maintain and that

it was difficult to get Computermax to do software modifications.

26. In order to keep costs in line, UCR negotiated and elicited from Computermax, as of December 28, 1988, the opportunity to purchase a site license—that is, a license to add as many "U Can Rent" stores as possible to its single RMAX Host System without incurring any additional remote store license fees—for the discounted price of $100,000.00. Computermax usually sells such a license for $150,000.00. The $100,-000.00 price that Computermax quoted UCR, moreover, included $37,500.00 already owed Computermax for past due remote store license fees. At UCR's request, Computermax agreed that the site license offer would remain open until December 31, 1990. (Plaintiff's Exs. 14–16.)

*Development of the Infringing System*

27. Ultimately, because of its dissatisfaction with Computermax's unwillingness to make modifications and other financial considerations as well as the desire to have all Archer-owned stores on the same computer program, UCR decided to develop an in-house computer software system that would perform the same functions and exhibit the same capabilities as did the RMAX System. UCR began by developing a remote store system.

28. Nevertheless, throughout 1990, UCR continued to express interest in obtaining a site license for the RMAX System, and at one point paid the $37,500.00 past due balance. UCR, however, never actually accepted or rejected Computermax's offer or paid the $62,000.00 balance necessary to acquire the site license.

29. In December, 1989, UCR contracted with System Builder Technologies, Inc. ("System Builder") to license a computer programming tool called "SB+". SB+ is a "code generator". Code generator programs like SB+, enable computer programmers to code sophisticated computer programs with added speed and relatively little creative or intellectual effort.

30. With the use of a code generator, which was described as a sort of electronic paintbrush, a programmer can, for example, code a program to display a screen to reflect how he wishes the screen that will be generated by the finished program to look. The programmer—using the cursor and keyboard—"paints" upon the screen the features he wants the program-generated screen to display, including the data "fields"[1] that he wishes to be included on the screen. Programs to develop reports and files can also be created this way.

31. Thereafter, with virtually the punch of a button, the code generator produces a program that carries out the functions that the programmer has requested. The code generator also produces documentation for the resulting software program. Thus, when using a code generator, the development of a software system consists almost entirely of the design of the system, while only a small portion of the process involves coding of the system.

32. After UCR contracted with System Builder to obtain its SB+ program to assist in the development of the UCR System, it hired David Naugle in January 1990, first as an independent contractor and later an employee, to help program the UCR System.

33. UCR never asked Naugle to sign any sort of confidentiality agreement regarding the RMAX System[2].

34. Naugle testified that as of January 1990, there was no indication that UCR had done any design work on the UCR System.

35. At Mr. Cherry's specific instruction, Naugle studied the RMAX System running at UCR for approximately one week to see how it worked and, specifically, how it retrieved and processed information from

---

**1.** Fields represent specific locations within files for storing individual pieces of information. There are no standards for positioning pieces of information within a file group or group of files. The expert testimony indicated that the most important stage of system design is determining what data to collect and maintain, and how to organize and access that data, because this process defines the operation of the entire software program.

**2.** Ironically, Naugle testified that UCR asked him to sign a confidentiality agreement concerning the UCR System.

UCR's remote stores. Naugle testified that he was directed to study the RMAX System's files, screen and reports in order to gain an understanding of what UCR wanted to duplicate in developing the UCR System. Naugle specifically examined the RMAX Remote Store System's file layouts and printed out various RMAX files[3], reports and dictionaries.

36. Cherry also worked on the development of the UCR System. By this time, Cherry was intimately familiar with the RMAX Remote Store System, including its file layouts, screen and reports. Cherry worked on the UCR System's development in addition to his other duties as UCR's data processing manager.

37. In January 1990, Naugle and Cherry went to System Builder's office in Atlanta to be trained in the use of the SB+ programming tool. During their training, Cherry and Naugle used the file layouts and file names that they had copied from the RMAX Remote Store System.

38. After they had completed their training, Cherry and Naugle returned to UCR's home office and began programming the UCR System. UCR dedicated one room at its home office to the development of the UCR System. The room contained a PC computer, on which UCR System programming was done, and a terminal that permitted access to UCR's minicomputer, on which the RMAX System was running.

39. In the process of programming the UCR System files by copying comparable RMAX files, Cherry and Naugle sometimes modified the RMAX files, usually by adding additional data elements to the ends of the files. Other than these occasional additions, however, the principal UCR System files are nearly identical to the corresponding RMAX Remote Store System files.

40. Copying the existing RMAX file structures to develop comparable UCR System files made the development of the UCR System relatively simple and permitted Cherry and Naugle to work quickly. Using the SB+ programming tool, Cherry and Naugle could simply duplicate an RMAX Remote Store System file onscreen, possibly add additional features, then direct SB+ to generate the code that used these files.

41. Generally, this process also was employed to develop many of the UCR System's screens and reports. Naugle testified that the UCR System programmers would set up screens and reports for the system simply by copying the corresponding screens and reports from the RMAX System. The UCR System's screens and reports were laid out so that they had the same look and format, and included the same data elements in the same order, as comparable RMAX System screens and reports.

42. During the development of the UCR System, therefore, there generally was no need to design any of the files, screens or reports. Cherry and Naugle simply copied the designs of the existing RMAX Remote Store System files, screens or reports— using the same layouts and naming conventions—onto the portable computer on which the UCR System was designed using SB+.

43. During their training at System Builder, and on several subsequent occasions during the development of the UCR System, Cherry and Naugle were instructed and assisted with programming by Mark Auclair, a System Builder employee who also never signed a confidentiality agreement regarding the RMAX System.

44. Neither Naugle nor Auclair had any prior experience in or knowledge of the rent-to-own business. Cherry testified that prior to programming the UCR System, he

---

**3.** Files are designated areas for storing information on a computer system. There are no standards for determining which files are needed to accomplish a particular task. The determination of how to store data in files is a crucial element in the design process of a computer software system. This layout or blueprint for data storage is the foundation upon which a computer system is built, and is the result of a creative thought process. For example, when creating a file, a system designer must make numerous decisions concerning the material to be included in the file, the order of that material and how that material can be accessed and used by the system.

had never worked on developing a system of comparable magnitude.

45. The Court finds Mr. Naugle's testimony regarding the facts surrounding the development of the UCR System to be the most credible evidence presented because he is a disinterested third-party who presently has no association or dealings with any of the parties to this case.

46. Naugle testified that the stated goal during the programming of the UCR System was to develop a remote store software system that would perform the same functions, exhibit the same capabilities and generate the same reports as the RMAX Remote Store System. UCR wanted to replace the RMAX Remote Store System and, consequently, save money, without sacrificing any of its data processing capability.

47. Additionally, Naugle testified that he had continuous access to the RMAX System, including its source code, while coding the UCR System. When he or Cherry was confronted with a problem, they routinely would refer to the comparable file or routine in the RMAX System. Naugle testified that Cherry instructed him to look at the RMAX Remote Store System on several occasions to see how it handled various programming problems that they encountered. Auclair also referred to the RMAX System on a number of occasions, with Cherry's permission, to answer programming questions.

48. Furthermore, Naugle and Cherry frequently referred to the RMAX System when they had questions regarding how files were put together or what particular screens or reports looked like. They did so to make certain that the UCR System's files, screens and reports captured all of the same data included in the comparable RMAX files, screens and reports.

49. At one point Naugle became concerned about the propriety of copying files, screen and reports from the UCR System, and voiced his concern to Cherry. Cherry, however, thought copying was simpler.[4]

50. Naugle and Cherry never referred to any other rent-to-own system while developing the UCR System because Cherry was committed to duplicating the RMAX Remote Store System as closely as possible.

51. Naugle testified that he and others made notes during the coding of the UCR System, but he left all such notes in Cherry's and UCR's possession at the conclusion of his employment. Cherry denied that any such notes were taken during the development of the UCR System. The Court finds that Cherry's testimony is not credible based on his demeanor on cross-examination and his status as an interested party.

52. Moreover, even if Cherry's testimony was accepted as true, it would show that the UCR System was designed, programmed and tested the program without taking any notes whatsoever. Considering the size and sophistication of the UCR System, as well as the limited experience of those developing it, the absence of notes is evidence that UCR and Cherry developed the UCR System by copying the RMAX Remote Store System.

53. In the late stages of developing the UCR System, in-house auditors at UCR examined the UCR System to determine whether it was functioning properly. Naugle testified that the auditors did so by running the UCR System and the RMAX Remote Store System on two computers, side-by-side, and requesting alterations to the UCR System until its calculations coincided with those done on the RMAX System.

54. After less than ten months, the UCR System was installed for testing in a number of UCR's "U Can Rent" stores. This relatively short amount of time is remarkable in light of Defendants' expert witness, Jim Weinstock's testimony that design is clearly the most substantial, most creative and most intellectually demanding phase in the development of a computer

---

4. Interestingly, Cherry testified that he considers the UCR System to be a trade secret of the system owner because of the purportedly unique way that it is structured and performs various functions.

software system. Weinstock stated that the design phase [5] accounts for up to ninety percent of the time and intellectual input required to develop a system when a code generator is used. Both the coding phase of the process and the final testing phase accounts for a relatively small portion of the overall process.

55. Cherry testified, however, that the design of the UCR System accounted for an extremely small portion of the overall development of the system. For example, Cherry admitted that the design of the UCR System file layouts only took approximately two weeks of the seven month programming process.

56. Thus, by copying files, screens and reports from the RMAX Remote Store System, UCR and Cherry copied the design of that system. As a result, UCR was able to develop the UCR System in a fraction of the time necessary simply by going through the relatively simple coding process, a process that was made even less difficult by the use of SB+.[6]

### Detection of Misappropriation and Infringement

57. At an early stage of the programming, UCR placed a new, "wrap around" menu on its RMAX System, which afforded access to the system only after an additional, confidential password was entered. The new menu restricted Computermax's access to UCR's RMAX System, making it impossible for Computermax to conduct the audits provided for in the License Agreement.

58. When questioned about the new menu, Mr. Cherry told Computermax that UCR had added the menu purely for security reasons. On one occasion Cherry provided Computermax with the password necessary to access the RMAX System. In early February 1990, which was about the time UCR began developing the UCR System, however, Computermax was denied access to UCR's RMAX System altogether. The denial of access, along with UCR's request that Computermax leave the offer to purchase a site license open for one year, see ¶ 26, supra, and its continuing assurances to Computermax that it was still interested in acquiring a site license, indicates that UCR was seeking to prevent Computermax from learning that UCR was working on its own system.

59. On or about February 13, 1991, after having been denied telephone access to UCR's RMAX Host System by the new menu, and desiring to conduct an audit of UCR's RMAX System as provided in the License Agreement, Wayne Wilhelm, Computermax's President, dialed into what he expected to be the RMAX Remote Store System installed at the UCR retail stores in Athens, Georgia. Wilhelm discovered, however, that the store was using a rent-to-own software system that UCR contended it had developed itself.[7]

60. The initial "menu" screen of the system exhibited a notice stating that the system was the property of David T. Cherry and that Cherry was the holder of the copyright of and to this "UCR System". (Plaintiff Ex. 22.)

61. Thereafter, on or about February 17, 1991, Wilhelm audited seventeen additional UCR retail store locations, and discovered that eleven of those locations were using the UCR System rather than the RMAX Remote Store System.

62. Wilhelm was unable to access any of the UCR System's screens on either occasion and was unable to look at any source or object code. He was, however, able to examine the structure of certain files in the UCR System.

63. Upon examination of the file structure and layout of the UCR System, Wil-

---

**5.** The design phase includes interviewing the user, determining input and output, and structuring files and reports.

**6.** Naugle testified that the appropriation of the RMAX Remote Store System's design saved UCR from six months to one year of UCR development time.

**7.** Defendants contend that Mr. Wilhelm's actions violated UCR's trade secrets, which is an excellent illustration of "the pot calling the kettle black."

helm discovered that the UCR System performed the same functions and exhibited the same capabilities as the RMAX Remote Store System. The UCR System also contained essentially identical file layouts, file names and data names and had a file structure identical to the RMAX Remote Store System.

64. After discovering the similarity between the two systems, Wilhelm printed out several data files from the UCR System. He then compared the structure and layout of each system's data files. Wilhelm concluded that the two systems were substantially similar and, in many respects, identical. He then retained legal counsel and brought the instant action against UCR and Cherry seeking money damages and injunctive relief for copyright infringement, misappropriation of trade secrets and, as to UCR, breach of the License Agreement.

### Transfers of the RMAX and UCR Systems

65. At approximately the same time Computermax filed this action, in the Spring of 1991, Chrysler First Commercial Corporation ("Chrysler") and Transamerica Credit Corporation foreclosed upon UCR and its related companies, which ceased conducting business. Transamerica foreclosed on the assets of Classic Rental and Archer Capital in March of 1991, and Chrysler foreclosed on the assets of UCR, Galleria Home Centers and First Choice Rentals in May of 1991.

66. UCR assigned all of its copyrights and other proprietary and intellectual property rights in and to the UCR System to Defendant James Archer, its Chief Executive Officer and sole stockholder, immediately prior to the May 1991, foreclosure. Archer then assigned such rights in and to the UCR System to Defendant L & B Rents, Inc. ("L & B Rents"), a California rent-to-own company of which he is the Chief Executive Officer and sole shareholder.

67. L & B Rents currently claims all rights to the UCR System pursuant to these assignments.

68. Furthermore, L & B Rents has received Copyright Registration TX 3057805 for the UCR System, with March 25, 1991, as the effective date of registration. The Copyright Registration designates Archer as the author of the UCR System.

69. At Archer's direction, L & B Rents has also licensed the right to use the UCR System to Defendant South Carolina Rentals, Inc. ("SC Rentals"), another company of which Archer is Chief Executive Officer and sole stockholder, and to U Can Rent, Inc. ("U Can Rent").

70. L & B Rents received a credit in the amount of $268,000.00 from Chrysler as a one-time license fee for permitting U Can Rent to use the UCR System. (Plaintiff's Ex. 31.)

71. SC Rentals has never operated stores under the "U Can Rent" name, and has never been licensed to use either part of the RMAX System. SC Rentals currently is using the UCR System, however, to conduct day-to-day business operations in its approximately thirty-three retail store locations, which operates under the name "Ace TV."

72. At Archer's direction SC Rentals is also using an unlicensed copy of the RMAX Host System that it apparently obtained from UCR upon or just prior to the foreclosure. Cherry testified that he copied and then loaded UCR's most recent version of the RMAX Host System onto a second minicomputer at UCR's home office around the time of foreclosure, and then sent that computer to SC Rentals's home office in Athens, Georgia. SC Rentals, however, has never had and presently does not have a license from Computermax for the RMAX Host System it is currently using. Furthermore, Computermax has never consented to the assignment of the RMAX Host System from UCR, or any other company, to SC Rentals.

73. Mr. Archer and Mr. Tassone, President of SC Rentals, testified that SC Rentals possesses the right to the unlicensed use the RMAX Host System and the RMAX Remote Store System (the UCR System is a copy or a derivative of the RMAX Remote Store System) in its thirty-

**348**

three stores because it is an Archer-owned company and therefore, Computermax is not damaged. The Court rejects these contentions.

74. Jerome Tassone, President of SC Rentals, testified that it is using the RMAX Host System obtained from UCR, that UCR in turn obtained it when it acquired another rent-to-own company, Shamrock Rentals, in 1988. SC Rentals argues that since Shamrock Rentals was an RMAX System licensee, its use of the RMAX Host System obtained from Shamrock Rentals is legitimate.

75. This contention falls for two reasons. First, an RMAX Host System is not assignable without Computermax's consent, and Computermax never consented to such an assignment, either from Shamrock Rentals to UCR or from Shamrock Rentals to SC Rentals. No such consent was ever requested and the evidence shows that Computermax was not even aware that UCR possessed Shamrock Rental's copy of the RMAX Host System. The RMAX Host System presently in use at SC Rentals is a copy of UCR's RMAX Host System, which the License Agreement expressly restricted to use on the single host computer at UCR's home office in Bogart, Georgia. That RMAX Host System is presently licensed to U Can Rent.

76. Second, when UCR and its affiliated companies were foreclosed upon in 1991, Archer took the rights to the UCR System with him and, by his own admission, assigned all rights his companies had in the RMAX System to the foreclosing creditors, who thereafter continued to use the RMAX System. At most, Archer's companies had only the right to use the RMAX System. This right was fully assigned to his creditors. Therefore, Archer could not and did not retain any right to use the RMAX System in any subsequent business activities. Consequently, SC Rentals's use of the RMAX Host System is unlicensed.

77. For the reason stated above, SC Rentals has never had the right to use the RMAX Remote Store System by virtue of being owned by Archer. Additionally, SC Rentals is not one of the UCR-affiliated, Archer-owned companies, which operated stores under the name "U Can Rent". It was not tied to the RMAX Host System at UCR's home office and was never licensed to use the RMAX Remote Store System.

SC Rentals is a wholly separate company, which operates stores under the name "Ace TV." Before it began using the UCR System hooked up to a copy of the RMAX Host System, SC Rentals used a system called TRIM. Thus, even if Archer did retain some entitlement to use the RMAX System, that entitlement would not apply to SC Rentals. Therefore, SC Rentals's use of the UCR System has damaged Computermax.

### Expert Testimony

78. Having considered the expert testimony presented by both parties regarding the structural similarities that actually exist between the two systems at issue, the Court concludes that Rick Ramsden, Computermax's expert, gave the best supported and most credible testimony.

79. Mr. Ramsden explained his analysis and comparison of certain aspects of the two systems, including their file structures, record layouts, transaction codes and internal documentation. He then concluded that the UCR System was developed by copying those elements, *i.e.*, the design, of the RMAX Remote Store System.

80. Mr. Ramsden demonstrated, and the Court finds, that the design of the two systems, as evidenced by their respective file layouts, file names, transaction codes, screens and reports, are substantially similar, and in some instances, virtually identical. Based on this evidence, Mr. Ramsden concluded that the design of the RMAX Remote Store System was copied by UCR and served as the basis for the UCR System.

81. For example, the field definitions of the common files in the two systems are strikingly similar. Almost uniformly, fields present in the file layouts of the RMAX Remote Store System are also included in the UCR System. The data elements appear in the respective files of both systems in identical order, and in most in-

stances, are the same length. The ordering method utilized in the RMAX Remote Store System, however, is not alphabetical or otherwise systematic, nor is it functionally significant in any respect. Thus, there is no reason why the UCR System should have the same data elements in the same order that the RMAX System does, absent copying.

82. A specific example, which strongly evidences copying, is the Rental Agreements file in each system. The RMAX Remote Store System's Rental Agreements file contains five "late payment" fields in consecutive order. In the RMAX file, "LATE.1", "LATE.2" and "LATE.3" appear as the eighteenth, nineteenth and twentieth fields, respectively, while the "LATE.4" and "LATE.5" fields appear in the forty-third and forty-fourth positions. Obviously, the two latter fields were added some time after the first three "LATE" fields. The UCR System's Rental Agreement file utilizes the exact same ordering method. (Plaintiff's Ex. 68.) The Court agrees with Mr. Ramsden's conclusion that a programmer creating a new file from scratch logically would have placed these five data files together, rather than placing three together, inserting twenty-three unrelated fields, and then adding another two. The only reasonable explanation for this similarity is that the UCR System's programmers copied the RMAX Rental Agreements file.

83. Such similarities appear between all of the principal files in the two software systems. (See Plaintiff's Exs. 66 [Comparison of Inventory Master Files], 57 [Comparison of Customer Master files], and 69 [Comparison of Merchandise Code files].) The chance that such duplication between the two systems is coincidental, even acknowledging that they are both designed for use in the same industry, is highly unlikely. Furthermore, while some file layouts in the UCR System have a number of fields that do not appear in RMAX Remote Store System files, these additional files frequently appear as fields added at the end of the nearly identical, RMAX-derived file layouts. (Compare Plaintiff's Ex. 55 to Ex. 56, Ex. 57 to Ex. 58, Ex. 59 to Ex. 60, and Ex. 61 to Ex. 62.)

84. The same is true of data elements included in and added to the UCR System's screens and reports. (Compare Ex. 32 to Ex. 33, Ex. 34 to Ex. 35, Ex. 36 to Ex. 37, Ex. 38 to Ex. 39, Ex. 40 to Ex. 41, Ex. 42 to Exs. 43–44, Ex. 45 to Ex. 46, Ex. 47 to Ex. 48, Ex. 49 to Ex. 50, Ex. 51 to Ex. 52, and Ex. 53 to Ex. 54.)

85. Mr. Ramsden noted that the similarities he discovered occurred in the first few files he examined from both systems. He opined that if he had continued to examine files, he would have encountered additional evidence of copying.

86. Moreover, the transaction codes [8] in the two systems are very similar. (Plaintiff's Exs. 63, 64.) A comparison of the two systems reveal that there are exact matches between the transaction codes, several of which are counterintuitive and thus, unlikely to be coincidental.

87. The transaction code values in the UCR System for "AN," "AR," "AT," "CN," and "IN" are identical to the RMAX Remote Store System codes and descriptions. Naming conventions derived from descriptions of the corresponding transactions, however, would suggest a reverse ordering of the characters actually used in the two systems. For example, "CN" is the transaction code for "New Customer" in both systems. The transaction "New Customer", however, would suggest the transaction code of "NC", rather than "CN". Thus, the Court finds that the transaction codes provide additional evidence of copying.

88. Likewise, since the UCR System permits transaction codes of up to four characters, one would expect that its transaction codes would have the number of characters necessarily to sufficiently represent the corresponding transaction. The "Inventory Charge Off" transaction in the

---

**8.** A transaction code is a randomly selected, alphanumeric sequence of characters that indicates to the computer what steps should be executed in a given situation or "transaction" when the code is transmitted.

UCR System, however, duplicates the RMAX System's "CO" transaction code rather than using the more intuitive description of "ICO." Similarly, for "Inventory Status Change," the UCR System duplicates the RMAX System's "SC" transaction code, rather than using "ISC." These similarities are further evidence that UCR and Cherry copied the RMAX Remote Store System when developing the UCR System.

89. The RMAX Remote Store System's record layouts, file structures, naming conventions and transactions codes are not functionally necessary in any respect, and are not dictated by the nature of the rent-to-own business. Rather, those elements were designed by Computermax from a myriad of possible options and alternatives. Defendants failed to offer a plausible reason why these elements of the two systems would be so similar, aside from illegal copying.

90. Defendants' own expert, Jim Weinstock, conceded that the file layouts for the UCR System appear to have been copied from the RMAX Remote Store System. Mr. Weinstock stated that there were "shadows" of the RMAX Remote Store System throughout the UCR System. He attributed the similarities between the two systems to the fact that the data from the RMAX Remote Store System had been moved over into the UCR System, with the result that the same data elements appeared in the latter system as in the former, and in the same order. Mr. Weinstock claimed that this process was common in the computer systems development industry, and that he often developed systems for his customers using the same method.[9]

91. The Court rejects Mr. Weinstock's explanation in this regard for three reasons. First, it conflicts with David Naugle's testimony that various parts of the UCR System were copied from the RMAX

System. Second, there is a distinct difference between the data contained in the computer program file, which is the property of the program user, and the structure or layout of the file that contains the data, which is the property of the program owner. Third, on cross-examination, Mr. Weinstock conceded that it is possible, and not too difficult to write a "conversion program", which permits the data from one system to be moved into another, structurally different system [10].

92. Furthermore, the "hit list" file on the UCR System is compelling evidence of copying. On cross-examination Cherry conceded that even though UCR never used the "hit list" file in the RMAX Remote Store System, the UCR System also has a "hit list" file that no one has ever used. If the users of the UCR System do not have, and have never had, a use for the "hit list" file, then it would not have been included in the UCR System, if the system were an original work. The presence of the "hit list" file on the UCR System indicates that it was copied along with other files.

93. Having considered the weight and credibility of the evidence presented by Naugle and Ramsden regarding the circumstances under which the UCR System was developed and the striking similarities between the two systems, the Court finds that UCR and Cherry in fact developed the UCR System by copying and/or referring to the RMAX Remote Store System, including its file layouts, file names and transaction codes.

94. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, then this Court construes such findings as conclusions of law.

## CONCLUSIONS OF LAW

Plaintiff's Amended Complaint sets out three theories of recovery against the Defendants: (1) copyright infringement; (2)

---

9. Mr. Weinstock admitted that he does not know whether this practice is legal under the trade secret and copyright laws.

10. In fact, Mr. Wilhelm testified that he often writes such conversion programs when he con-

verts a rent-to-own business to the RMAX System from a competitor's program. Thus, the Court is not convinced that Mr. Weinstock's practice of "transferring data" is an accepted

misappropriation of trade secrets; and (3) breach of contract.

### I. Copyright Infringement Claim

 Any act that is inconsistent with a copyright holder's exclusive rights constitutes infringement. 17 U.S.C. § 501(a) (West Supp.1991); *see also United States v. Wise*, 550 F.2d 1180, 1186 (9th Cir.), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290. A copyright holder has the exclusive rights of reproduction, preparation of derivative works, distribution, performance and display. 17 U.S.C. § 106 (1977 and West Supp.1991). Plaintiff claims that the Defendants infringed its copyrights in a number of ways.

 First, Computermax contends that UCR's product is either a "copy" of the RMAX program or a "derivative work" based on the RMAX System. In order to establish a claim for copyright infringement, a plaintiff must establish ownership of a valid copyright in the work and copying by the defendant. *Southern Bell Tel. and Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 810 (11th Cir. 1985). Plaintiff has established the first prong of the test for copyright infringement. A Certificate of Registration, if timely obtained, constitutes *prima facie* evidence of the validity of the copyright and of the facts stated therein. 17 U.S.C.A. § 410(c). Defendants do not dispute that Computermax owns a valid copyright in and to the RMAX Host System and the RMAX Remote Store System software, having an effective date of April 12, 1991. (Plaintiff's Exs. 3–8).

 A plaintiff may prove the second element of the test, i.e., copying, either by direct evidence or by establishing that the defendant had access to the plaintiff's copyrighted work and that the defendant's work is substantially similar to the copyrightable material. *Walker v. Time Life*

*Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). In the present case, Plaintiff presented direct evidence of copying through the testimony of David Naugle. Thus, if the portions of the RMAX System that Defendants copied is copyrightable, then Plaintiff prevails.

 The Court will employ a substantial similarity test in determining whether Plaintiff's copyright covers the non-literal elements it claims were copied[11]. The Court notes that Defendants concede the issue of access. Thus it is not at issue.

### A. Copyright Protection for a Computer Program's Non–Literal Elements

Non-literal elements are protected by copyright if the "component in question qualifies as an expression of an idea, rather than an idea itself." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir.1989); (non-literal aspects such as "structure, sequence and/or organization of the program, the user interface, and the function or purpose of the program" are copyrightable to the extent that they are expression); *see Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 1992 WL 139364 (2d Cir.1992); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir.1992); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1248 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 436 (4th Cir.1986); *Lotus Dev. Corp. v. Paperback Software Int'l.*, 740 F.Supp. 37 (D.Mass.1990); *Manufacturers Technologies, Inc. v. Cams, Inc.*, 706 F.Supp. 984 (D.Conn.1989); *Digital Communications Assocs. v. Softklone Distrib. Co.*, 659 F.Supp. 449 (N.D.Ga.1987); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F.Supp. 1127 (N.D.Cal.1986); *Q–Co. Industries, Inc. v. Hoffman*, 625 F.Supp. 608, 615–616 (S.D.N.Y.1985); *SAS Institute,*

---

practice in the computer programming industry.

**11.** This approach permits the Court to address Defendants' challenge to the copyrightability of the non-literal element as well as their arguments that the works are not substantially similar. Even if the Court determined that the

works were substantially similar, it still would have to determine that the similarities pertained to copyrightable material. *See Brown Bag Software*, at 1476 ("[a]nalytic dissection is relevant not only to the copying element of a copyright infringement claim, but also to the claim's ownership element").

*Inc. v. S & H Computer Sys., Inc.,* 605 F.Supp. 816 (M.D.Tenn.1985); *E.F. Johnson Co. v. Uniden Corp. of Am.,* 623 F.Supp. 1485 (D.Minn.1985); see also *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 547, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985); 17 U.S.C. § 102(b).[12] Thus, in the present case the Court must determine whether the non-literal elements at issue represent idea or expression.

Two circuit courts have set forth two different tests to determine how to distinguish idea from expression when evaluating the non-literal elements of a computer program. Plaintiff urges this Court to adopt the Third Circuit's position as stated in *Whelan* while Defendants advocate the analysis set forth by the Second Circuit in *Computer Associates.*[13] For the reasons stated below, the Court rejects the *Whelan* idea/distinction test and adopts the analysis set forth in *Computer Associates.*

### 1. Rejection of *Whelan*

In *Whelan* the plaintiff alleged that the defendant had copied the non-literal structure of its dental lab management program. In making the idea/expression distinction the Third Circuit set forth the following test:

> [T]he line between idea and expression distinction may be drawn with reference to the end sought to be achieved by the work in question. In other words, the purpose or function of a utilitarian work would be the works idea, and everything that is not necessary to that purpose or function would be part of the expression of the idea ... Where there are various means of achieving the desired purpose, then the particular means chosen is not

necessary to the purpose; hence there is expression not idea.

797 F.2d at 1236 (citations omitted). The appellate court concluded that the idea of the plaintiff's program was "the efficient management of a dental laboratory," and since that "idea could be accomplished in a number of different ways with a number of different structures, the structure of the ... program [was] part of the program's expression." *Id.* at n. 28. The Third Circuit ultimately held that "copyright protection of computer programs may extend ... to the [program's] structure, sequence and organization." 797 F.2d at 1248.

The sheer simplicity of the Third Circuit's idea/expression analysis tempts the Court to adopt its test. Unfortunately, the simplicity that makes the test so attractive, also makes it "conceptually overbroad" and "descriptively inadequate." *Computer Assoc.,* 1992 WL 139364 at *11–12. (citations omitted). Moreover, as discussed in *Computer Assoc.,* the rationale underlying the test in *Whelan* "allow[ed] copyright protection beyond literal computer code ... [in order to] provide the proper incentive for programmers by protecting their most valuable efforts." 1992 WL 139364 at *19. Essentially this rationale articulates the "sweat of the brow" doctrine, which was emphatically rejected as the basis for copyright protection in *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* — U.S. —, —, 111 S.Ct. 1282, 1291, 113 L.Ed.2d 358 (1991). *Computer Assoc.,* 1992 WL 139364 at *18. Thus, since the rational underlying the *Whelan* test has been rejected by the Supreme Court and since the test is inadequate to address the complexity of computer programs, the Court declines to utilize the *Whelan* analysis.[14]

---

**12.** Section 102(b) states:
In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, or discovery, regardless of the form on which it is described, explained, illustrated, or embodied in such work.

**13.** Defendants advocated the district courts analysis in *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 775 F.Supp. 544 (E.D.N.Y.1991), *aff'd,* 1992 WL 139364 (2d Cir.1992).

**14.** Nevertheless, the Court acknowledges that Plaintiff would prevail if the *Whelan* test were employed to determine copyrightability/substantial similarity of the material copied. Mr. Wilhelm testified that there was no standard file structure in the rent-to-own industry and that he had converted data from other rent-to-own programs to make the data compatible with the RMAX Remote Store System design. Furthermore, Plaintiff's expert testified that while the data elements included in a file are important,

### 2. *Adoption of Computer Associates*

#### a. Three-step analysis

■ The Second Circuit recently approved the following three-step analysis in *Computer Associates,* based on the abstractions test [15] to determine whether the non-literal elements of two computer programs are substantially similar. The first step in the *Computer Associates* test is "abstraction". Abstraction requires a district court to "dissect the allegedly copied program's structure and isolate each level of abstraction contained within it ... [t]his process begins within the code and ends with an articulation of the programs ultimate function." 1992 WL 139364 at *13.

The next step is "filtration", which "entails examining the structural components at each level of abstraction to determine whether their particular inclusion at that level was 'idea' or was dictated by considerations of efficiency." *Id.* 1992 WL 139364 at *14. This step employs the merger doctrine to define the scope of a plaintiff's copyright. *Id.* An element in a computer program is dictated by efficiency if it is the "only and essential means of accomplishing a given task." *Computer Assocs.,* 1992 WL 139364 at *14 (citation omitted).

Furthermore, the court must weed out structural elements that are dictated by external factors such as "(1) the mechanical specifications of the computer on which a particular program is intended to run; (2) compatibility requirements of other programs with which a program is designed to operate in conjunction; (3) computer manufacturers' design standards; (4) demands of the industry being serviced; and (5)

widely accepted programming practices within the industry." *Id.* 1992 WL 139364 at *16 (citation omitted). Finally, the court should determine whether any of the elements of the plaintiff's program are from the public domain. *Id.* 1992 WL 139364 at *17.

The last step in the substantial similarity test is a comparison of the protected expression in the allegedly infringed program and the defendant's program. The inquiry here "focuses on whether the defendant copied any aspect of this protected expression, as well as an assessment of the copied portion's relative importance with respect to plaintiff's overall program." *Id.*

#### b. Plaintiff's Objections to Analysis

Plaintiff attacks the test on two grounds. First, Plaintiff contends that the district court did not rely on any body of legal precedent in establishing its test, rather it relied on the philosophy of the court appointed expert. The Court finds that the test is well-grounded in traditional concepts of copyright law and takes the unique nature of computer programs into consideration. Furthermore, a number of district courts have utilized various elements of the test to determine the copyrightability of non-literal elements in computer programs. *See Computer Assocs.,* 1992 WL 139364 at *15–17 *(citing, e.g., Manufacturers Technologies, Inc. v. Cams, Inc.,* 706 F.Supp. at 995–999; *Softklone Distrib.,* 659 F.Supp. at 460 (N.D.Ga.1987); *Lotus Dev. Corp.,* 740 F.Supp. at 66; *Q-Co. Indus.,* 625 F.Supp. at 616).

Second, although Plaintiff contends that the adoption of the test will afford the non-literal aspects of computer programs little or no protection, two cases on which Plain-

---

the industry does not dictate the order in which they appear. Consequently, since the file structures could be organized in any number of different ways, the structure, sequence and organization would be protected expression.

**15.** The abstractions test for separating idea from expression provides:

Upon ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.

The last may perhaps be no more than the most general statement of what the [work] is about and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his "ideas" to which, apart from this expression, his property is never extended. *Computer Assocs.,* 1992 WL 139364 at *13 (quoting *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

tiff relies to support its own case essentially employed the *Computer Associates* test. *See Lotus Dev. Corp.*, 740 F.Supp. at 60–61 (defendant infringed the plaintiff's copyright in a computer spreadsheet program by copying the design of the menu command structure in the original program, including the command terms, structure and order of those terms, prompts and their presentation on the screen) *Id.* at 68–74; *Manufacturers Technologies*, 706 F.Supp. at 994–998 (defendants infringed the plaintiff's copyright in cost estimate programs by copying the design of significant screens, abbreviations of terms, convention for providing status information on screen pages and overall sequence and flow of screen displays). *Id.* at 1001–1002.

Admittedly, the facts in *Computer Associates* are of little value since the case involved copying of the source and object code, which are literal elements. Nevertheless, *Lotus Dev. Corp.* and *Manufacturers Technologies* provide guidance in applying the Second Circuit's analysis to non-literal elements. Consequently, the Court reject Plaintiff's arguments and adopts the Second Circuit's idea/expression analysis.

### B. Application of Second Circuit Analysis

#### 1. Abstraction

Plaintiff contends that the design of its computer program was allegedly infringed by the UCR System. The design of its computer program is comprised of file structures, transaction codes and screens and reports. Since the literal elements of the RMAX System are different, the Court will proceed to analyze each of the elements of the RMAX System's design under the second prong of the test.

#### 2. Filtration

■ The merger doctrine states that when an idea can only be expressed in one way, the idea and the expression merge, and the result is not copyrightable. *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988). Thus, if the ways in which the file structures, screen and reports and transaction codes may be expressed in a limited number of ways, they are not copyrightable.

#### a. File Structures

Plaintiff submitted three examples of file structures,—the "Inventory Master", "Customer Master" and the "Rental Agreements"—which allegedly were infringed by the Defendants. Defendants contend that the programs are only similar in their file names and the sequence of the field names within each file. The selection and arrangement of the field definitions within the files, however, are the expression of an idea. *See Eckes v. Card Prices Update*, 736 F.2d 859, 862–863 (2d Cir.1984) (selection and arrangement equals expression).

■ Defendant also claims that the files structures are dictated by market forces. Defendants' assertion, however, is contradicted by the evidence. The ordering method utilized in the RMAX System is not alphabetic or otherwise systematic, nor is it functionally significant in any respect. Mr. Wilhelm testified that when he had converted rent-to-own companies from other computer programs to the RMAX Remote Store System, he had to write a conversion program to transfer the data from the old system into the RMAX System, which means that the other computer programs have file formats that are different from those in the RMAX Remote Store System. Thus, the sequence of field definitions is not dictated by the industry.

Although Defendants' expert testified that elements in the two programs were similar because of the nature of the industry, Mr. Cherry, who "developed" the UCR System did not corroborate this opinion. Mr. Cherry testified that he and Mr. Naugle designed the file structures by transferring the data in a file from the RMAX Remote Store System file to the UCR System. Mr. Weinstock conceded that transferring the data effectively transferred the file format. Thus, Mr. Weinstock's opinion not only is contradicted by Plaintiff's expert, it is also contradicted by the facts of the case as testified to by the two men who allegedly "developed" the program.

Furthermore, Mr. Ramsden testified that the field definition sequence did not have to be in any particular order to interact with the RMAX Host System. Thus, the field definition sequence in the UCR System's file formats was not dictated by the goal to interact with the RMAX Host System. Thus, the evidence shows that Computermax designed its file structures from a myriad of possible options and alternatives. *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d at 436 (4th Cir.1986) (where there is virtually an unlimited number of instruction sequences that would enable a programmer to construct a program with same function as another, original program is copyrightable "expression", rather than unprotected "idea"); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir.1983).

▮ The Court also rejects Defendant's contention that Computermax's file structures are merely blank forms. "[B]lank forms, which do not convey information or contain original pictorial expression are not copyrightable." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 971 (11th Cir.1983) (citations omitted); *Softklone Distrib.*, 659 F.Supp. at 449. File structures, however, that "collect and organize information entered by the user, are sufficiently informative to deserve protection." *Id.* at 461. Consequently the file formats are expression not idea.

### b. Screens and Reports

▮ Plaintiff presented a number of screen and reports for comparison. *See* ¶ 84, *supra.* Essentially, the analysis used in determining the copyrightability for the file formats is applicable to the screens and reports. Plaintiff's expert testified that the field definition sequence in the screen and reports was not dictated by the industry. Again, the data fields could have been arranged in any number of ways. Thus, the screens and reports represent protected expression.

### c. Transaction Codes

▮ Transaction codes tell a computer how to act on a transaction. The idea

behind a transaction code is that it is a abbreviated representation of a shortcut to the execution of a particular transaction. Plaintiff's expert testified that transaction codes were a major part of a program design, that they could be anything, and that they were unique to the particular system designed. Defendants' expert did not testify that these codes were dictated by efficiency or the industry. Rather, he testified that it would not make sense to change the codes because then the employees who were familiar with the RMAX System transaction codes would have to learn new ones. This is not an external factor, which would negate the copyrightability of the transaction codes. Consequently, the transaction codes are protected.

### 3. Comparison

▮ Based on the finding of fact set forth in paragraphs 78–93, *supra,* the Court concludes that the RMAX System's file formats, screens and reports and transaction codes constitute the foundation of the same elements in the UCR System. Undoubtedly, the Defendants copied the sequence, structure and organization of the RMAX Remote Store System's file formats and screens and reports as well as its transaction codes in programming the UCR System. The "hit list" referred to in paragraph 92 is particularly compelling evidence of copying and substantial similarity. *See E.F. Johnson Co.*, 623 F.Supp. at 1496 (existence of identical unnecessary instruction in both codes is strong proof of substantial similarity); *SAS Inst.*, 605 F.Supp. at 824 (presence of nonfunctional instruction in both copyrighted and allegedly infringing code probative of copying).

Defendants contend that the works are not substantially similar because a number of data fields, which do not appear in RMAX Remote Store System file formats, do appear in UCR System file formats and screen and reports. The Copyright Act gives a copyright owner the exclusive right to prepare derivative works. 17 U.S.C.A. § 106(2). "A work consisting of editorial revisions, annotations, elaborations, or oth-

er modifications, which as a whole, represent an original work of authorship, is a derivative work." 17 U.S.C. § 101. Any contribution by the Defendants is irrelevant because the Court has concluded that the UCR System was based upon the RMAX Remote Store System. As indicated, even Defendant's expert indicated that there were "shadows" of the RMAX Remote Store System throughout the UCR System. Even if the UCR System is a derivative work, the Defendants still infringed Plaintiff's copyright by violating its exclusive right to prepare derivative works. *See* 17 U.S.C. § 106(2). Consequently, Defendants UCR, Cherry and Archer have infringed Plaintiff's copyright by their actions. *See Lotus Dev. Corp. v. Paperback*, at 68–74; *Manufacturers Technologies, Inc., v. Cams, Inc.*, at 1000–1002 (D.Conn. 1989).

### C. Defense Under 17 U.S.C. § 117

■ Finally, the Court rejects Defendant's § 117 defense. Section 117, which is a limitation on the exclusive rights of computer program copyright owners, provides:

> Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>
> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or
>
> (2) that such new copy or adaption is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.
>
> Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations may be transferred only with the authorization of the copyright owner.

17 U.S.C.A. § 117 (West. Supp.1992).

First, Defendants never "owned" a copy of the RMAX Remote Store System. Defendants leased the system from Computermax and had possession of the source and object codes. Defendant's possession of those codes did not make them the "owner" of them. Second, § 117(1) expressly provides that the adaptation can be used in "no other manner". Mr. Naugle testified that Cherry talked to him about marketing the UCR System, Cherry asserted that he held the proprietary right in the system and a copyright was obtained for the system. The evidence hardly indicates an intention to keep the system "in-house". Third, § 117(2) states that adaptation copies must be destroyed if continued possession of the computer program should cease to be rightful. As discussed, in paragraph 75, *supra*, once Archer assigned his right to use the RMAX System to his creditors, his use of the system ceased to be rightful. At that time any adapted copies should have been destroyed. Finally, the section provides that adaptations may only be transferred only with the authorization of the copyright owner. Computermax never consented to any such transfer of the UCR System. Consequently, Defendants do not fall within the protection of § 117.

### D. Violation of Other Exclusive Rights

■ In addition to UCR and Cherry copying portions of copyrightable material in the RMAX Remote Store System to develop the infringing UCR System, Defendants infringed Computermax's copyrights in other respects. First, UCR infringed Computermax's copyrights in and to the RMAX System by breaching the license agreement. A material breach of a copyright license agreement constitutes infringement. *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1043 (D.C.Cir.1981); *see also, e.g., S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 10870–1089 (9th Cir.1989) (licensee infringes owner's copyright if licensee's use exceeds scope of copyright); *SAS Inst.*, 605 F.Supp. at 838 (licensee's breach of

license agreement constituted infringement of owner's copyright). Consequently, UCR infringed Computermax's copyrights by assigning the infringing UCR System to the other Defendants.

 UCR also infringed Computermax's copyrights when it disclosed and/or transferred a copy of the RMAX Host System to SC Rentals without permission to do so. Furthermore, L & B Rents infringed Computermax's exclusive right to distribute copies of its work by asserting ownership over the infringing UCR System and then licensing the right to use such system to SC Rentals and U Can Rent. *See* 17 U.S.C. § 106(3) (1977) (exclusive right to distribute copies of copyrighted work by sale, transfer of ownership, rental or lease).

 Archer similarly infringed Computermax's copyrights by personally claiming and later assigning rights in and to the infringing UCR System to L & B Rents, by directing L & B Rents to assign those rights to SC Rentals and U Can Rent and by directing SC Rentals to use the UCR System in connection with the unlicensed use of the RMAX Host System. *See Southern Bell Tel. and Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801 (11th Cir.1985) ("[a]n individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity, is personally liable for the infringement ... even if [individual] was ignorant ·of the infringement"). *Id.* at 811 (citations omitted). Finally, SC Rentals has infringed Computermax's copyrights by using and continuing to use, the infringing UCR System, as well as an unlicensed copy of the · RMAX Host System.

## II. Misappropriation of Trade Secrets

 Plaintiff claims that Defendants misappropriated its trade secret, i.e., the RMAX Remote Store System and the RMAX System by copying the RMAX Remote Store System, licensing the use of the UCR System, which is a copy of the RMAX Remote Store System, providing access to the RMAX System to unlicensed third parties, using the UCR System.

### A. Definition of Trade Secret

A "trade secret" is:

[I]nformation including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, *a program*, a device, a method, a technique, [or] a process ... which:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can readily obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10–1–761(4) (emphasis added). Thus, computer software programs are trade secrets if the two pronged test is met. Computermax derives significant economic value from the RMAX System. As stated, Computermax licenses the RMAX System to users in exchange for license fees. Computermax mainly develops systems for the rent-to-own industry. Consequently, the RMAX System is computermax's main source of income.

In addition, the evidence shows that Computermax has made considerable efforts to maintain the secrecy of the RMAX System. The RMAX System is registered as an unpublished work containing trade secrets under special provisions of the Copyright Act. Computermax licenses the RMAX System under license agreements that strictly prohibit disclosure of the RMAX System to unauthorized third parties. The License Agreement under which UCR and Cherry obtained access to the RMAX System prohibited such disclosure, restricted any reproduction by UCR of the RMAX System and prohibited assignment to third parties. Moreover, RMAX System documentation contains proprietary notices.

Furthermore, Computermax's employees sign confidentiality agreements and are aware of the secrecy of the product. When employees have to print out RMAX source

code to work with it, or for any other reason, they are required to shred their copies of the source code. The RMAX System is not shown to those who do not license it or sign some sort of nondisclosure agreement. Consequently, the court concludes that the RMAX System is a trade secret of Computermax.

## B. Misappropriation Under Georgia Law

The Georgia Trade Secrets Act of 1990 defines "misappropriation" of a trade secret to include:

(A) Acquisition of a trade secret ... by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret without ... [the owner's] express or implied consent by a person who:

 (i) Used improper means to acquire knowledge of a trade secret;

 (ii) At the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was:

 (I) Derived from or through a person who had utilized improper means to acquire it;

 (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

 (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use ...

O.C.G.A. § 10–1–761(2). Defendants contend that Section 301(a) of the Copyright Act preempts Plaintiff's claims for misappropriation of trade secrets.

## C. Preemption

Section 301(a) expressly preempts "all legal or equitable rights that are equivalent to any exclusive rights within the general scope of copyright as specified by Section 106" when the work of authorship in which rights are claimed fall "within the subject matter of copyright as specified by Sections 102 and 103" of the Copyright Act. 17 U.S.C. § 301(a). This section is modified by section 301(b)(3), which provides that:

[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 ...

17 U.S.C.A. § 301(b)(3) (1977).

█ Essentially section 301 sets forth a two-part test for preemption. *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, at 199–200 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) First, the work of authorship must fall within the subject matter of copyright as defined in sections 102 and 103 of the Copyright Act. *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838, 849 (D.Mass.1986). A computer program is considered a literary work. *Computer Assocs.*, 1992 WL 139364 at *8 (citations omitted). Thus it is protected under Section 102(a)(1) of the Act.

Second, the state law is required to create "legal or equitable rights that are equivalent to any exclusive rights within the general scope of copyright as specified in section 106." *Harper & Row Publishers* at 200. Thus, "any right under state law, which is violated by the same single act that would infringe one of the exclusive rights granted pursuant to the federal copyright act, is preempted." *Computer Assocs.*, —— F.2d at ——, 1992 WL 139364 at *24 (citation omitted). A state law right is not equivalent to one established in section 106, however, when it requires action "beyond mere reproduction or the like." *Id.*

█ Plaintiff's asserts that the Defendants misappropriated its trade secrets by the following actions, which the Court agrees occurred: (1) UCR's and Cherry's unauthorized copying of the design of certain key elements of the RMAX Remote Store System in violation of O.G.C.A. § 10–1–761(2)(B); (2) UCR provided access to the RMAX System to unlicensed third parties such as Naugle and Auclair and transferred the resulting UCR System, which is a derivative/copy of the RMAX System, to

Archer, U Can Rent and, eventually, to L & B Rents and SC Rentals; (3) Archer knowingly disclosed them when he took the infringing UCR System from UCR prior to foreclosure, assigned it to L & B Rents and then directed L & B Rents to license the UCR System to SC Rentals and U Can Rent; (4) Archer directed SC Rentals to use an unlicensed copy of the RMAX Host System; (5) L & B Rents asserted ownership rights in the infringing UCR System and licensed it to SC Rental and U Can Rent; and (6) SC Rentals used the infringing UCR System and an unlicensed copy of the RMAX Host System.

■ These causes of action are not preempted because they involve the additional element of a breach of confidentiality, which was owed to Computermax under the license agreement and the common law. "The legislative history behind [section 301] makes clear that '[t]he evolving common law rights of ... trade secrets ... would remain unaffected as long as the causes of action contain elements, such as ... a breach of trust or confidentiality, that are different in kind from copyright infringement.'" *Computer Assocs.*, 1992 WL 139364 at *24 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, *reprinted in*, 1976 U.S.C.C.A.N. 5659, 5748); *see, e.g., Southern Mississippi Planning & Dev. Dist., Inc. v. Robertson*, 660 F.Supp. 1057 (S.D.Miss.1986) (state law claim for conversion of trade secrets in computer software was not preempted by Copyright Act); *Warrington Assocs., Inc. v. Real–Time Eng. Sys.*, 522 F.Supp. 367, 369 (N.D.Ill. 1981) (tort of trade secret misappropriation is premised on breach of confidentiality, not copying). Consequently, all the Defendants are liable for the damages caused by the misappropriation of Computermax's trade secrets. Furthermore, the Court finds that the Defendants' actions in misappropriating the trade secrets were willful and Computermax is entitled to punitive damages.

## II. Breach of Contract

■ The License Agreement between Computermax and UCR provided that (1) title and full ownership rights in and to the RMAX System remained solely with Computermax, (2) UCR recognized Computermax's proprietary rights in the RMAX System and agreed not to make any reproduction of the RMAX System or any of its components for any purposes whatsoever, save for purposes of normal back-up requirements, (3) UCR was to take all reasonable steps necessary to ensure that the RMAX System was not made available in any form to anyone not subject to the License Agreement, (4) UCR was not to assign or transfer any of its rights thereunder without Computermax's written consent, and (5) Computermax was entitled to conduct unencumbered telephone audits of the RMAX System to check for unlicensed remote users.

The Court finds, as a matter of law, that UCR breached all of the above-stated provisions of the License Agreement. For example, in programming its "own" software system by copying and/or referring to key elements of the RMAX Remote Store System, UCR usurped and wrongfully appropriated for its own use the rights of title and full ownership in and to the RMAX System, which rights were retained solely by Computermax. UCR also repudiated its contractual acknowledgement of Computermax's proprietary rights in and to the RMAX System, and essentially reproduced the RMAX Remote Store System for purposes other than those provided in the License Agreement.

UCR also breached the agreement by providing access to the RMAX System to unlicensed third-parties such as Auclair, Naugle, L & B Rents and SC Rentals, in derogation of its duty to keep the RMAX System secret. UCR transferred the RMAX Host and Remote Store Systems to U Can Rent without permission to do so. UCR also transferred a copy of the RMAX Host System to SC Rentals, which is now using the system despite having no license to do so. *See* ¶¶ 72–77, *supra*. Furthermore, UCR breached the agreement by licensing and/or transferring the UCR System, which is a derivative of the RMAX System, to L & B Rents and/or SC Rentals.

Finally, UCR. deliberately inhibited Computermax's right to conduct telephone audits of the RMAX System, in violation of the License Agreement. Consequently, the Court concludes that UCR breached the License Agreement and is liable to Computermax for all damages incurred as a result of the breach.

## IV. REMEDIES

### A. Damages/Attorney's Fees

Although the evidence in this case is closed, the Court is interested in hearing any legal arguments concerning damages and attorney's fees. Consequently the Court will decide these issues at a later time after briefing and oral argument if either party desires to be heard. A schedule will be set by the court in the near future.

### B. Permanent Injunctive Relief

 Pursuant to 17 U.S.C.A. § 502 (1976) and O.C.G.A. § 10–1–762 (West Supp.1991), all of the Defendants, with the exception of SC Rentals, from this day forward, **PERMANENTLY ARE ENJOINED** from engaging in, undertaking, aiding, abetting, or facilitating the use, manufacture, distribution, lease, licensing or sale of the UCR System, or of the RMAX Host or RMAX remote Store System, or any other merchandise, goods or articles constituting infringements of Computermax's copyrights in and to the RMAX system or misappropriation of Computermax's trade secrets. This injunction is binding upon the Defendants, their officers, agents, servants, employees and attorneys, and upon those persons in active concert with them who receive actual notice of this Order.

Upon payment by the Defendants of all the damages to be awarded, SC Rentals shall be permitted to continue its use of thirty-three (33) copies of the UCR System and one copy of the RMAX Host System *provided that* within thirty days of this Order, Defendants assign all rights they have in the UCR System to Computermax and SC Rentals executes the standard RMAX Remote Store and Host System li-

cense agreements with Computermax. Thereafter, SC Rentals shall not expand its use of the UCR System, or use of any additional copies of the RMAX Host System, without executing the appropriate license agreements and paying the applicable license fees to Computermax. Unless and until the Defendants pay all the damages to be awarded, however, SC Rental is subject to and hereby **ORDERED** to comply with the permanent injunction imposed on the remaining Defendants.

## CONCLUSION

Accordingly, for the reasons stated above, the Court finds in favor of the Plaintiff.

SO ORDERED.