**TDS HEALTHCARE SYSTEMS CORPORATION**

v.

**HUMANA HOSPITAL ILLINOIS, INC. and Phamis, Inc.**

v.

**Eugene Santa CATTARINA and Bill W. Childs.**

Civ. No. 1:92–cv–1319–ODE.

United States District Court, N.D. Georgia, Atlanta Division.

March 31, 1995.

Julian D. Fleming, Jr., Ann Grunewald Fort, Sutherland Asbill & Brennan, Atlanta, GA, for TDS Healthcare Systems Corp.

L. Joseph Loveland, Jr., Richard L. Shackelford, Robert M. Keenan, III, King & Spalding, Atlanta, GA, for Humana Hosp. Illinois, Inc.

Emmet J. Bondurant, II, Bondurant Mixson & Elmore, Atlanta, GA, Peter S. Ehrlichman, phv, Robert J. Riley, phv, Warren J. Rheaume, phv, Foster Pepper & Shefelman, Seattle, WA, for Phamis, Inc.

Julian D. Fleming, Jr., John L. North, Ann Grunewald Fort, Sutherland Asbill & Bren-

nan, Atlanta, GA, for Eugene Santa Cattarina and Bill W. Childs.

## ORDER

ORINDA D. EVANS, District Judge.

This diversity action primarily involves allegations of breach of contract and misappropriation of computer-based trade secrets. The case is before the court on Plaintiff TDS Healthcare Systems Corporation's ("TDS") motion for Rule 37 sanctions against Defendant PHAMIS, Inc. ("PHAMIS"), PHAMIS's motion for summary judgment against TDS, Defendant Humana Hospital Illinois, Inc.'s ("Humana Illinois") motion for summary judgment against TDS, TDS's motion for summary judgment against Humana Illinois on contract claims, and Counterclaim Defendants TDS, Childs, and Cattarina's motion for summary judgment as to PHAMIS' counterclaim.

Unless otherwise stated, the following facts are undisputed. TDS and PHAMIS are both engaged in the development and licensing of computerized hospital healthcare information systems. Typically such systems record, process and transmit data used to manage patient care, accounting and other administrative functions involved in hospital management. Humana, Inc. (not a party herein) is the owner of numerous proprietary hospitals. Since 1989 Humana, Inc. has owned 10% of PHAMIS' stock. PHAMIS has installed computer-based healthcare information systems at Humana hospitals since 1989 pursuant to a contract with Humana, Inc. which called for the development of a model which could be used system-wide in Humana hospitals. In 1990 Humana, Inc. became interested in purchasing the assets of Michael Reese Hospital, a large teaching hospital in Chicago, Illinois. Defendant Humana Illinois was formed in early 1991 to purchase the assets of Michael Reese Hospital.

From mid–1981 until early 1992, Michael Reese Hospital used a computer-based hospital information system developed and licensed by Plaintiff TDS called the TDS Healthcare 4000 System. An important aspect of the system, which is at the heart of this litigation, was its "Physician Order Entry" ("POE") feature. POE was designed so as to induce physicians, rather than support personnel, to enter patient treatment and medical orders in the computer. POE did not require typing on the physician's part, but relied on a "light pen" (operated by a point and click device) and also included rapid screen sequencing so as to minimize waiting time at the computer. With respect to medication orders, which constitute a large percentage of orders entered by physicians in hospitals, the TDS system offered an interactive feature whereby the screen would display information pertaining to alternative possible medications, and then (in subsequent screens) information concerning the various generic and brand name medicines available, and then information concerning dosage units and route of administration for the medicine of choice. The system was designed so that the entry of the doctor's order would result in the necessary authorization/direction/information being routed to various appropriate units within the hospital (*e.g.*, pharmacy, nursing station, accounting office). Orders could be authorized and sent as a group or individually.

At the time the 4000 system was installed at Michael Reese, Michael Reese and TDS (then named Technicon) entered into a written contract which stated in pertinent part:

> Technicon [TDS] asserts, and Customer [Michael Reese Hospital] acknowledges, that the products of Technicon, including, but not limited to its system(s), computer programs and documentation, and all information, data and designs related thereto, disclosed herein and in the Schedules and Attachments and which will be further disclosed during the term of this Agreement or in training or as may be included in operating manual incidental to Technicon systems, programs and/or documentation hereunder, are and will remain unpublished, are confidential, and are the exclusive property of (proprietary to) Technicon. Technicon retains all rights to the foregoing except to the extent rights are expressly granted in this Agreement. Except as expressly authorized by Technicon in writing or required by law, Customer [Michael Reese Hospital] will use its best

efforts to keep the foregoing in confidence and will not duplicate, use for a purpose other than carrying out the terms of this Agreement or disclose, in whole or in part the contents and/or subject matter of this Agreement, or any other document, for which Technicon has provided written notification to Customer designating such confidentiality at the time of delivery. All improvements in connection with the Agreement shall vest in Technicon, provided that the Customer shall have the same rights and privileges therein as provided in this Agreement.

Notwithstanding the aforementioned, all items deemed proprietary by ... [TDS] shall be so labeled. All information that is not or does not become publicly available and is so marked as proprietary shall be deemed proprietary by Customer [Michael Reese]. The term "publicly" available shall not include disclosures made through fault of Customer.

TDS supplied Michael Reese Hospital with various hardware and software components in connection with its system. Software "object code" was supplied in the form of reel-to-reel magnetic tapes which bore a notice stating "The information and designs disclosed herein are proprietary to Technicon Data Systems Corp. [TDS] and shall not be duplicated, used or disclosed, in whole or in part, except with the express permission of the owner." The holders containing the TDS system software bore labels stating they contained proprietary information which should not be disclosed. Each page of the technical manuals and one or more pages of the training manuals delivered to Michael Reese contained a proprietary notice stating that the document contained "confidential, trade secret information proprietary to Technicon Data Systems Corp. ["TDS"]." The TDS system was designed to allow it to be customized through use of matrix code, which also was supplied to Michael Reese by TDS as a part of the software.

By October of 1990, Humana, Inc. had determined to purchase Michael Reese Hos-

pital. At that time, Humana, Inc. and Michael Reese personnel discussed the replacement of the TDS system with the PHAMIS system. They recognized that, because Michael Reese doctors had become accustomed to POE, it would be desirable for the PHAMIS system (which had been used at other Humana hospitals) to include a similar feature.

On October 30, 1990,[1] TDS, Humana, Inc. and Michael Reese entered into a nondisclosure agreement in connection with the preacquisition due diligence activities representatives of Humana, Inc. were then undertaking. That agreement stated in pertinent part:

MICHAEL REESE HOSPITAL ... ("Customer") requests permission to disclose the [1981] agreement between TDS ... and Customer ... as amended and information, data, designs and documentation related thereto (collectively known as "Proprietary Information" to HUMANA, INC.... ("Third Party") for the purpose of allowing Third Party to evaluate the Proprietary Information. In consideration of TDS's agreeing to such disclosure to Third Party, Third Party agrees to the following:

Third Party clearly understands that the Proprietary Information contains trade secret information of TDS and/or its suppliers; is and shall remain an unpublished work protected by common law copyright; is disclosed for the sole purpose stated above and for no other reason and for no other purpose whatsoever; remains the property of TDS and/or its suppliers; and any written Proprietary Information is to be returned to TDS at TDS's expense. Acceptance or receipt of the Proprietary Information by Third Party is an acknowledgement thereby that the Proprietary Information is being received in confidence and that, in consideration for the disclosure, neither it nor any of the information which it contains in any form will be reproduced, used, or disclosed, in whole or in part, by or to anyone employed by Third

---

1. The agreement indicates that Humana, Inc.'s representative executed the agreement on April 6, 1990. TDS's representative did not indicate the date he signed the agreement. Michael Reese Hospital's representative executed the agreement on October 30, 1994.

Party not having a need to know consistent with the purpose of disclosure or anyone not employed by Third Party without prior written consent of TDS. . . .

· In consideration of TDS's approval of the disclosure of Proprietary Information to Third Party, Customer agrees to ensure the adherence by Third Party to all the terms of this Nondisclosure Agreement, and shall be jointly and severally liable to TDS in the event of any breach by Third Party of this Nondisclosure Agreement.

(Seibert dep., exh. 3).

TDS does not claim that TDS's computer code, software, or training manual were turned over to Humana, Inc. prior to Humana Illinois' acquisition of Michael Reese Hospital pursuant to the 1990 nondisclosure agreement.

Defendant Humana Illinois purchased the assets of Michael Reese Hospital in February of 1991 and took over operations of the hospital on March 1, 1991. Humana Illinois continued using the TDS system but began studying it with a view toward adding the equivalent of physician order entry to PHAMIS' system.

Prior to the acquisition of Michael Reese by Humana Illinois, PHAMIS already had a well-developed computer-based hospital information system which permitted doctors, as well as support personnel, to enter patient care orders through computer terminals, and which addressed a wide range of accounting and administrative functions. However, PHAMIS' system was organized differently from TDS's system in that it did not offer incentives for physicians, rather than support personnel, to use the system. Thus, the PHAMIS system had an "order communication module" which could be used by nurses, doctors, or other personnel at nursing stations to enter physicians' orders into the system. In the case of the entry of an order by a non-physician, the order could not be acted upon until the system received information that the doctor had "signed off" on the order. The system's "order communication module" was not linked to its "pharmacy module," so that the entry of medication orders could not be entered via the communication module. Medication orders could be entered only in the pharmacy.

Humana Illinois employee Grant Averill was the project manager for the change-over process to the PHAMIS system. His duties included studying and documenting the manner in which the TDS system handled medication orders. Averill's work was carried out pursuant to a project work request approved by management of Humana, Inc. The project was called "Physician Order Entry."

To study the TDS system, Averill used a password issued by TDS and the TDS computer training manuals. Averill studied the sequence of the screens involved in medication order entry. Humana Illinois disputes TDS's assertion that Averill compiled a "work flow analysis" of the TDS system but does agree that Averill compiled a "work flow document describing the basic ordering process of the physician order entry functionality." (Humana Illinois' response to TDS's statement of material facts, ¶ 31). In carrying out his work, Averill dealt both with officials of Humana, Inc. and PHAMIS. Averill provided PHAMIS with "(1) an eleven page work flow analysis/document dated June 6, 1991, which contains a description of the physician order entry system and a portion of the training manual that had been provided to Averill; (2) an April 19, 1991 memorandum which includes copies of screen prints, some of which also reveal the matrix code and (3) a July 10, 1991 memorandum containing detailed descriptions of the nursing and pharmacy portions of POE and examples of medication orders as they were received by the Michael Reese pharmacy. Averill gave at least 314 different screen prints from the TDS system, all of which individually contained TDS's matrix code, to Laurie Lancaster of PHAMIS.

Averill testified at his deposition that he did not recall reviewing any materials which were marked confidential or proprietary. Humana Illinois does not dispute the fact that screen prints were turned over to Humana, Inc. and PHAMIS which contained TDS's matrix code. However, Humana Illinois argues that the matrix code was meaningless to Averill and to those employees of Humana, Inc. who saw the screen prints.

PHAMIS makes the same argument. Humana Illinois and PHAMIS also argue that to the extent Averill sat and watched the sequence of screens on the computer terminal while studying the POE feature, no proprietary information was revealed because any employee or visitor to the hospital may see material on an end-user screen. Humana Illinois also claims that under the terms of the 1981 nondisclosure agreement, "proprietary information" was defined so as to exclude information otherwise publicly available. TDS's 4000 system was regularly displayed in trade shows, demonstrations and in various publications; therefore, Humana Illinois argues that by definition Averill did not see any proprietary information within the meaning of the parties' contract. Humana Illinois also argues that because a confidentiality warning was not contained on the screens viewed by the end-user, the material Averill viewed on the screens was not labelled as required so as to preserve its proprietary nature, if indeed it was proprietary. Humana Illinois and PHAMIS also argue that TDS has failed to sufficiently identify a "trade secret" such that it can be judicially determined whether any information acquired or observed by PHAMIS or Humana Illinois constitutes the taking of a trade secret.

Grant Averill's analysis of POE was sent to Laurie Lancaster, a PHAMIS vice president, and to Dr. Malcolm Gleser, the PHAMIS executive who made programming changes to PHAMIS' system to add medication order entry capability similar to TDS's. Gleser described the POE as a medication "order entry for the order communication system to make medication order entry ... have the same look and feel as the entry of any other order." (Gleser dep. of 5/5/93 at 108). Gleser's own description of the modification he achieved is that he "opened a path between the existing order communication modules and the pharmacy module." (TDS Statement of Material Facts Regarding TDS's Contract Claims Against Humana Illinois, ¶ 37). Gleser states he spent an aggregate of about three weeks programming the

changes, finishing around June 20, 1991. (*Id.* at 109, 129). Gleser denies that he relied on information provided by Grant Averill for the modification of the PHAMIS program. TDS disputes that Gleser's work merely involved opening the ordering pathway. The modified PHAMIS system "went live" at Michael Reese Hospital in February 1992.

Unlike TDS's system, the modified PHAMIS system does not utilize a light pen.[2] Instead, the PHAMIS system relies on the entry of numerical values and text by means of a keyboard. To place an order in the PHAMIS POE system, physicians must type the letters "ORD" and the desired patient's medical record number. This raises a "Common Order Menu" screen which contains all current orders except medications and a list of the common types of orders, such as pharmacy, radiology, and dietary. The physician types the number associated with the department of interest and the F1 key. This raises a department-specific screen from which physicians may place orders. The pharmacy screen, for example, offers four groupings of medications from which physicians may select medications by using their associated number. They may select (1) from a list of 60 common medications by typing the associated number; (2) from a list of medications grouped by therapeutic class, such as antibiotics; (3) from a list of medications grouped by other criteria, such as common pediatric medications; or (4) by typing in the medication's generic or trade name. Selection of medications is finalized by hitting the F1 key, which brings up a screen resembling a paper order requisition. The physician fills in the requisition by typing into the appropriate fields or selecting a number associated with a protocol order which lists the most common dosage. The physician then reviews and confirms the order by hitting the appropriate key. There is no mechanism for selecting more than one order at a time.

After TDS began to suspect that Humana Illinois had pirated information from its system, TDS undertook an inquiry which in part forms the basis for a counterclaim filed by

---

2. PHAMIS and Humana Illinois' expert, Steven Henkind, derived the following information from an examination of several versions of PHAMIS' system, including the versions used initially and currently at Michael Reese Hospital.

PHAMIS, INC. against TDS. In February 1992, TDS employee Maria Dunn asked PHAMIS to send information on its products to her sister, a clinical director at another hospital. The sister obtained the brochures and forwarded them to Dunn who sent them to TDS's marketing department. The brochures were entitled "PHAMIS, INC.", "Product Overview," "Company Highlights," "Customer Profiles," and "Application Summaries." Each of the brochures contained a statement that it was confidential and should not be disclosed without the written permission of PHAMIS, Inc.

Also, beginning in March 1992 third party Defendant Bill Childs, editor of Healthcare Informatics, an industry magazine, visited several hospitals using the PHAMIS system including Michael Reese. Childs was acting as a consultant for TDS. He investigated the changes at Michael Reese at TDS president Eugene Cattarina's request because Michael Reese was the first client TDS had lost from a fully implemented client patient care system. Childs interviewed PHAMIS and Humana Illinois employees about the system's workings and may have obtained a copy of a PHAMIS brochure, "The PHAMIS, Inc. Vision," which TDS now possesses. Childs did not disclose his relationship with TDS to Humana Illinois or PHAMIS. After his visit to Michael Reese Hospital, Childs informed Cattarina that Humana Illinois had "literally copied" the TDS system.

The remaining factual bases for the counterclaim of PHAMIS, Inc. against TDS are drawn from the following. In 1983, TDS entered into negotiations to buy PHAMIS. During the negotiations (which were ultimately unsuccessful) PHAMIS supplied TDS with at least a portion of its 1983 business plan, a 50-page document. The plan contained a description of the LASTWORD System's order communication, pharmacy and laboratory modules. The plan was marked "confidential." There is no evidence that PHAMIS expected the document to be returned, or that it ever asked that it be returned. The 1983 business plan remained in TDS's files until discovery during the instant case at which time a copy was supplied to

PHAMIS' counsel. TDS also revealed to PHAMIS during discovery that in 1992 its marketing director had prepared a "Feature Function Grid" comparing PHAMIS' LASTWORD System with TDS's 7000 System. Also, PHAMIS learned during discovery that in 1990, TDS employee Kathy Crane had obtained a PHAMIS pamphlet entitled "Order Communication, Nursing Management, Care Plan Library and Nursing Implementation." The booklet contained a statement providing that it was "strictly confidential, and shall not be disclosed or duplicated in whole or in part, without prior permission from PHAMIS, Inc...." The record contains no evidence as to how Ms. Crane obtained the brochure, which describes the LASTWORD order communication module and, in particular, the system's use by nurses. Crane's deposition was not taken in this case. The booklet appears to have been prepared for businesses potentially interested in the LASTWORD System, not an internal PHAMIS document.

TDS's complaint alleges (1) actual and threatened misappropriation of trade secrets by Humana Illinois and PHAMIS; (2) breach of contract by Humana Illinois; (3) inducement of breach of contract by PHAMIS; and (4) violation of Georgia's Trade Secrets Act of 1990 by Humana Illinois and PHAMIS.

PHAMIS' counterclaim against TDS, its president Cattarina, and Bill Childs alleges they engaged in a program of industrial espionage aimed at obtaining confidential information about PHAMIS and its hospital information system, LASTWORD. PHAMIS alleges fraud, misappropriation of confidential business information, breach of contract, breach of fiduciary duty and violation of the Washington Consumer Protection Act.[3]

The court now turns to the various pending motions in this case.

### I. *TDS's Motions for Sanctions against PHAMIS*

TDS moves for Rule 37 sanctions against PHAMIS, arguing that PHAMIS failed to produce three types of documents in violation of the discovery orders of March 23, 1993

---

3. PHAMIS's headquarters is located in Washington.

and May 20, 1994: (1) physician access information; (2) monthly activity reports; and (3) financial information. The March 23 discovery order directed PHAMIS to respond to certain of TDS's discovery requests including TDS's Request to Produce #15.[4] The May 20 order denied in part TDS's motion to compel on the basis of PHAMIS' representation that it had provided all the POE-related information requested in TDS's Request to Produce No. 39.[5] TDS argues that PHAMIS "has developed or is developing" a functionality called Physician Access or Clinician Access ("PA") which is similar to POE and that this information would have been responsive to both Requests to Produce Nos. 15 and 39. (TDS's motion for sanctions at 2). TDS argues that although PHAMIS ultimately complied with some of the requests to produce, production was untimely and deprived TDS of the materials' use during discovery.[6] The sanction TDS seeks is default judgment.

PHAMIS responds that it has met all of its discovery obligations. It maintains that PA was developed entirely apart from the POE system, by different individuals, and does not involve writing orders. PHAMIS states that it did not produce documents related to PA because PA is unrelated to POE. PHAMIS claims that it subsequently offered (21 days before the close of discovery) to permit TDS to view the PA documents at PHAMIS' local counsel's office, but TDS declined in favor of filing this motion. PHAMIS also argues that the monthly activity reports were produced and complied with the May 20 order requiring disclosure of financial information.

**4.** TDS's Request to Produce #15 states:

All documents describing, referring to, or relating to any modification or improvement in the PHAMIS LASTWORD system which took place after October 25, 1990, or constituting, describing, referring to, or relating to any plan, status report, progress report, workload report, work request form, staff roster, flow sheet, PERT chart, coding sheet, source code, program, or other form having to do with such modifications or improvements.

**5.** Request to Produce No. 39 states:

Please produce all budget estimates, project work requests, requests for approval, project approvals, reports (including cost reports),

■■■■ The Federal Rules provide in pertinent part:

If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just ...

Fed.R.Civ.P. 37(b)(2). Rule 37 sanctions are designed to (1) compensate the court and other parties for the added expense caused by discovery abuses; (2) compel discovery; (3) deter others from engaging in similar conduct; and (4) penalize the offending party. *Wouters v. Martin County, Fla.*, 9 F.3d 924, 933 (11th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 65, 130 L.Ed.2d 21 (1994). Sanctions such as dismissal and default are warranted only when noncompliance with discovery orders is due to willful or bad faith disregard for those orders. *Id.* at 934. They should be supported with findings that lesser sanctions are not appropriate, of willfulness or bad faith, and of how the opposing party was prejudiced by the conduct. *Id.*

■■■ It appears that there may have been some confusion about the extent of discovery required in the court's previous discovery orders. In responding to TDS's motion to compel, PHAMIS stated that it had provided the requested POE information. PHAMIS apparently did not interpret that to include PA information. TDS is entitled to this information. All of PHAMIS' objections to Requests to Product Nos. 15 and 19 are overruled. To the extent that PHAMIS has not produced all material covered by Requests to Product Nos. 15 and 19, *including* PA information, it is hereby ordered to do so

memoranda, and correspondence prepared after January 1, 1991, that discuss, describe, or explain projects for modifications or improvements in physician order entry as implemented at Humana Hospital Illinois or as contained in any system sold or offered for sale by PHAMIS, or modifications or improvements in the order communication, pharmacy and nursing modules, applications, functions or features of the medical information system that have been installed or implemented at Humana Hospital Illinois or sold or offered for sale by PHAMIS.

**6.** Discovery ended on August 29, 1994. The record shows that on August 8, 1994, PHAMIS offered to make PA related documents available for review by TDS in Seattle within ten days.

within thirty (30) days. Because there is no clear evidence of willful or bad faith disregard for the court's previous orders, default is not appropriate. TDS is awarded its attorneys' fees incurred in bringing this motion.

## II. Motions for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on the motion, the court must view the evidence in a light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). To prevail on its motion for summary judgment, the movant must show that the evidence is insufficient to establish an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). For issues on which the non-movant bears the burden of proof at trial, the moving party is not required to produce evidence negating the opponent's claim. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). Instead, the movant may simply point out that there is an absence of evidence to support the non-movant's case. *Id.* at 1116. If the movant makes a sufficient showing, then the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). If the evidence supporting the non-movant's claims is insuffi-

cient for a jury to return a verdict for the non-movant, or is merely colorable or not significantly probative, then the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If, however, reasonable minds could differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a verdict for the non-movant, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. at 2511–12.

> A. *Motions for summary judgment by Humana Illinois and PHAMIS on TDS's claims for misappropriation of trade secrets, unfair trade practices in violation of Georgia's Trade Secrets Act, tortious interference with contract, and conspiracy to breach contract*

▆▆▆ The court finds that TDS's trade secrets claim is not preempted by federal copyright law. The Copyright Act essentially sets out a two part test to determine the reach of federal preemption in copyright cases.[7] If the work falls within the subject matter of copyrights, the elements of the state cause of action must differ from the copyright claim in a meaningful way. *Crow v. Wainwright*, 720 F.2d 1224, 1225–26 (11th Cir.1983), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984). The Act's legislative history makes clear that a breach of trust or confidentiality differs from a copyright infringement sufficiently that such common law trade secrets claims are not preempted. *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337, 359 (M.D.Ga.1992).

▆▆▆ Computer programs such as those at issue here are considered to be literary

---

7. The Copyright Act expressly preempts "all legal or equitable rights that are equivalent to any exclusive rights within the general scope of copyrights as specified by Section 106" when the work in which rights are claimed fall "within the subject matter of copyright as specified by Sections 102 and 103 of the Copyright Act." 17 U.S.C. § 301(a). The Act's preemptive scope is limited by section 301(b)(3) which states

> [n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... activities violating legal or equitable rights that are

not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

The court need not consider implied theories of preemption because the Act contains this express preemption clause, and that clause provides "a reliable indicium of congressional intent with respect to state authority." *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1520–21 (11th Cir.1994) (quoting *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)).

**1582**

works within the meaning of copyright law. *Id.* at 358. They therefore fall within the subject matter of copyrights. *Id.* TDS's trade secrets claim encompasses allegations of breach of trust or confidentiality. Consequently, these causes of action are not preempted.

■ To prove a violation of Georgia's Trade Secrets Act, a claimant must show that (1) it has trade secrets and (2) the opposing party misappropriated them. O.C.G.A. §§ 10–1–761, 763. Georgia law defines trade secrets as

information including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, or a list of actual or potential customers or suppliers which:

(A) Derives economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10–1–761(4). Computer software programs are trade secrets if the statute's two-pronged test is met. *CMAX/Cleveland,* 804 F.Supp. at 357. In Georgia, misappropriation of a trade secret means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." O.C.G.A. § 10–1–761(2)(A). Georgia also defines misappropriation of trade secrets as

disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of a trade secret;

(ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .

O.C.G.A. § 10–1–761(2); *Smith v. Mid–State Nurses, Inc.,* 261 Ga. 208, 403 S.E.2d 789 (1991).

■ Summary judgment for PHAMIS and Humana Illinois is unwarranted on the misappropriation of trade secrets and unfair trade practices claims under Georgia statutory and common law. Because it appears that PHAMIS failed to timely provide TDS with discoverable information about the PA system, the court cannot say that genuine issues of material fact do not exist.[8]

As to the interference with contract claim, given PHAMIS's sophistication in the development and licensing of computerized hospital healthcare information systems, it is likely that PHAMIS would have known or expected that TDS had procured contracts protecting the confidentiality of its work product used at Michael Reese Hospital. Given the evidence of the corporate relationship between PHAMIS, Humana, Inc., and Humana Illinois, the court will deny the motions for

**8.** The court finds that it has personal jurisdiction over Humana Illinois based upon the ten-year business relationship Humana Illinois and its predecessor in interest, Michael Reese Hospital, had with TDS, a corporation headquartered in Georgia. Between 1987 and 1990, Humana Illinois, through Michael Reese Hospital, made 249 telephone calls to TDS in Georgia and sent thirty employees to Atlanta for training on the TDS system. (Autry affidavit, ¶ 5; Kurth affidavit, ¶ 3). These purposeful acts, relating to the use of the TDS system, are sufficient to establish jurisdiction under the Due Process Clause and Georgia's long-arm statute. *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 627 (11th Cir.1994); *Davis Metals, Inc. v. Allen,* 230 Ga. 623, 625, 198 S.E.2d 285 (1973). The exercise of jurisdiction does not offend traditional notions of fair play and substantial justice because Humana Illinois purchased all of Michael Reese Hospital's assets and liabilities and the quality and number of contacts is substantial. *Francosteel,* 19 F.3d at 627.

summary judgment based upon PHAMIS' failure to produce the documents that are the subject of TDS's Rule 37 motion.

PHAMIS argues that summary judgment is appropriate on the conspiracy to breach a contract claim because no contract was breached. The court's resolution of the breach of contract claim against Humana Illinois (discussed below) moots this argument.

### B. TDS and Humana Illinois' cross motions for summary judgment on TDS's breach of contract claim

 The essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom. *Cartin v. Boles,* 155 Ga.App. 248, 252, 270 S.E.2d 799 (1980); *Turner v. Connor,* 192 Ga.App. 348, 349, 385 S.E.2d 19 (1989).[9] The goal of all contract interpretation is to find the true intent of the parties. *Southern Fed. Savings & Loan Ass'n v. Lyle,* 249 Ga. 284, 287, 290 S.E.2d 455 (1982). Where the contract terms are clear, the court will look to the contract alone to determine its meaning. *Id.; Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 446, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991).

██ It is undisputed that in 1981 Technicon (TDS's predecessor) entered into a valid contract to provide Michael Reese Hospital with computer services. In it, Michael Reese Hospital agreed that it would use its "best efforts" to keep Technicon's proprietary information confidential, and would not duplicate it or use it for purposes other than those contemplated by the contract. (TDS's motion for summary judgment at 13–14). The contract also states that all improvements vest in Technicon. The contract dealt with TDS's provision of computer services to Michael Reese Hospital. Humana Illinois does not dispute that it is bound by this agreement. (Humana Illinois' response at 18).

The court finds that during the acquisition of Michael Reese Hospital, Humana Illinois breached its assumed obligation to use its best efforts to keep TDS's proprietary information confidential. Best efforts would have included fully informing staff that TDS's proprietary information was confidential. The record shows that Humana Illinois undertook no efforts in this regard. Averill testified that during his work at Michael Reese Hospital, he never heard discussion regarding the confidentiality of TDS's information. (Averill dep. at 91). Humana Illinois' senior systems manager, Martin Paslick stated that he never discussed the confidentiality of the TDS system with anyone at Michael Reese Hospital. (Paslick dep. at 29). Further, the evidence shows that Michael Reese Hospital's pharmacy director gave demonstrations on the TDS system's POE capability to Humana Illinois' employee Averill and others, including PHAMIS' Gleser. Averill or his team was provided with the computer training manual and permitted to print out numerous screens designed by TDS containing TDS coding. (Scrutchins dep. at 75–81). Averill provided PHAMIS with (1) a June 6, 1991 work flow analysis which contains a description of the end-user screens in the POE system; (2) an April 19, 1991 memorandum which contains several end-user screens and some code information; and (3) a July 10, 1991 memorandum to Lancaster describing end-user screens in the nursing and pharmacy portions of the POE function and giving examples of medication orders as they were received by Michael Reese Hospital pharmacists under the TDS system. These screens were either part of the TDS system or modifications to the system permitted by the TDS system's customizing capacity. For the purposes of this motion, it does not matter which because the 1981 agreement provided that all improvements to the agreement would vest in Technicon [TDS]. In sending the work flow analysis, descriptions of the screens, and screens to Lancaster and Gleser of PHAMIS, Humana Illinois breached the contract to use its best efforts to keep TDS's proprietary information confidential. Whether Averill saw or understood the source codes on the

---

**9.** Because Georgia and Illinois contract law would treat this issue essentially the same, the court need not reach the choice of law issue Humana raised. *See Gymco Construction Co.,* *Inc. v. Architectural Glass & Windows, Inc.,* 884 F.2d 1362, 1364 n. 1 (11th Cir.1989); *Smith v. Jones,* 113 Ill.2d 126, 132, 100 Ill.Dec. 560, 497 N.E.2d 738 (1986).

screens he used is irrelevant to whether Humana Illinois used its best efforts.

■ Humana Illinois' argument that the information Averill sent was not sufficiently marked fails. Under the 1981 agreement, the word "proprietary" was a term of art. The agreement did not contemplate that every screen in the TDS system be marked confidential. The evidence reveals that TDS labeled as proprietary each canister containing computer code it delivered to Michael Reese Hospital and included the proprietary label on the first portion of TDS's programs. The screens on TDS's system came from tapes or software bearing a confidentiality label. (TDS's consolidated memorandum at 17). The court finds that labelling the canisters and underlying software confidential was sufficient labelling to retain the proprietary nature of the screens.

■ Humana Illinois' argument that the information it used was "publicly available" under the 1981 agreement is also unpersuasive. TDS's displays of its system at trade shows does not cause the system to lose its proprietary nature. Moreover, Averill did not view the TDS screens as one would at a trade show. He actually studied the TDS screens' content, format, and sequence, not as a trade show attendee or an end-user involved in patient care, but to aid in the development of PHAMIS' system at Michael Reese Hospital. (Averill dep. at 44). Also, the record contains no evidence that TDS's matrix code was ever displayed at trade shows.

The evidence also shows that this information was not used solely for purposes of carrying out the 1981 agreement. Instead, as noted, it was used to assist PHAMIS in providing and developing computer services. Because no genuine issues remain to be tried on TDS's breach of the 1981 contract claim against Humana Illinois,[10] summary judgment is appropriate. Questions of fact as to

intent and the extent of an agreement remain on the conspiracy claim.

It is undisputed that Humana, Inc., Michael Reese Hospital, and TDS entered into a nondisclosure agreement in 1991 under which TDS agreed to permit Humana, Inc. to view its proprietary information for the limited purpose of performing its due diligence evaluation of the TDS system before purchasing Michael Reese Hospital. The theory underlying TDS's claim of breach of this agreement, however, is unclear. At the time the 1990 nondisclosure agreement was executed, Humana Illinois was not even formed. Moreover, TDS has not explicitly alleged what was disclosed. Consequently, TDS's motion is denied to the extent it is premised on breach of the 1990 nondisclosure agreement.

### C. TDS, Childs, and Cattarina's motion for summary judgment on PHAMIS' counterclaims

■ Ordinarily, confidential business information not rising to the level of a trade secret[11] is beyond the purview of traditional Georgia property law and, thus, is not protectable from disclosure absent a contract. See Wesley–Jessen, Inc. v. Armento, 519 F.Supp. 1352, 1361 (N.D.Ga.1981). "The exception to this general rule is when such information was procured by improper means or otherwise disclosed without privilege, as in violation of a relation of confidence." Id. Georgia law contemplates liability against those who obtain confidential information by improper means for the purpose of advancing a rival business interest, "for the harm caused by [the] possession, disclosure, or use of the information." American Photocopy Equip. Co. v. Henderson, 250 Ga. 114, 115, 296 S.E.2d 573 (1982) (quoting Restatement of Torts § 759, comment (c)). Improper means includes

theft, trespass, bribing or otherwise inducing employers or others to reveal the information in breach of duty, fraudulent mis-

10. While not making a finding on damages, it does appear that the breach injured TDS. TDS invested substantial assets in developing its system and PHAMIS, as its competitor, saved time and money by studying TDS's system. This is sufficient to make a determination of injury.

11. As noted, PHAMIS concedes that the information TDS received was not a trade secret.

representations, threats of harm by unlawful conduct, wire tapping, procuring one's own employees or agents to become employees of the other for purposes of espionage and so forth.

*Id.* (quoting *Restatement of Torts* § 759, comment (c)). Although Georgia law does not conclusively define "confidential information," it appears that the information must (1) be the plaintiff's property; (2) be peculiar to its business; and (3) the disclosure or use of which by the defendant causes injury to the plaintiff. *See Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.,* 224 Ga. 160, 165, 160 S.E.2d 356 (1968). Further, the information must possess an element of secrecy peculiar to the complaining party, known only to it, not general secrets of the trade. *Id.* at 165, 160 S.E.2d 356.

Contracts limiting the disclosure of such information in perpetuity are unenforceable; time limitations are required. *See Thomas v. Best Mfg. Corp.,* 234 Ga. 787, 788, 218 S.E.2d 68 (1975). In the absence of a contract, however, it appears that such information is protected only so long as competitors fail to duplicate it by legitimate, independent research or until it becomes public property by being released on the market. *Taylor Freezer Sales,* 224 Ga. at 164, 160 S.E.2d 356; *Monumental, Inc. v. Frontier Disposal, Inc.,* 159 Ga.App. 35, 38, 282 S.E.2d 660 (1981).

Summary judgment is appropriate on the counterclaim. No genuine issues of material fact remain to be tried regarding the 1983 business plan. In ruling on PHAMIS' motion for preliminary injunction, the court previously determined that although there are some similarities between the plan and the Feature–Function Grid, they were not close enough to support a finding that TDS improperly used the plan.[12] In fact, there is no evidence that TDS used the 1983

business plan in any way or that it agreed to dispose of it after the negotiations. On the contrary, Mazzuckelli, TDS's marketing director, testified that she used no documents originating before 1986 to prepare any reports. (Mazzuckelli dep. of 8/20/92 at 59). Moreover, PHAMIS presented no evidence that it was or would be harmed by TDS's possession of this information. In fact, PHAMIS's president could not identify any specific harm from the unauthorized use of this document. (Sample dep. of 8/4/94 at 25). PHAMIS's argument that, because this document was distributed to certain employees, it must have been used is too speculative to create a genuine issue of fact. The court also previously found that the evidence failed to show that information contained in DX33, an internal marketing report, DX36, a report for a sales or marketing meeting, or DX38, a 1991 competitor overview, was obtained improperly from TDS. No new evidence refutes this finding.

As to the brochures Dunn obtained, the record shows that PHAMIS did not take reasonable steps to maintain the confidentiality of these documents. *See Monumental, Inc.,* 159 Ga.App. at 38, 282 S.E.2d 660 (confidential information becomes public property when released). There is no evidence that Dunn entered into a nondisclosure contract to secure the brochures, or was even requested to keep the information confidential. Nor is there evidence that PHAMIS attempted to verify that the caller was a prospective client or that the information was generally not disclosed.

This reasoning also applies to the information Childs acquired during his research and interviews with PHAMIS personnel.[13] PHAMIS released this information to a member of the press without requiring him to enter into a nondisclosure agreement and

12. PHAMIS' motion for preliminary injunction unsuccessfully sought to enjoin TDS from using its trade secrets. The court found that PHAMIS failed to show that the specific information at issue was confidential or that TDS made any use of it.

13. The court finds that it has personal jurisdiction over Childs. The record shows that for

several years he acted as a consultant for TDS. He reported to Cattarina in Atlanta and billed TDS in Atlanta. The record also shows that he visited Cattarina or Glen Crowe, another TDS executive in Atlanta on several occasions. These are sufficient contacts to establish jurisdiction. *Davis Metals,* 230 Ga. at 625, 198 S.E.2d 285.

knowing the information would be used to prepare articles about its system.

Likewise, no questions of fact remain to be tried on whether the documents obtained by Crane or Childs were acquired improperly. The record contains no evidence about how Crane got the brochures and only speculation regarding Childs.

In its order on the preliminary injunction, the court ruled that it would apply Georgia law in this action. Thus, the Washington Consumer Protection Act is not applicable in this action. Even if it was, however, the claim is susceptible to summary judgment because the Washington act, like Georgia's, does not provide a remedy for private disputes. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531, 536–38 (1986). Furthermore, one element of a claim under the Washington Consumer Protection Act is that the public interest must be affected by the act at issue. *See id.* The court finds that this case, dealing with purportedly confidential sales and investment brochures about computer products used in hospital administration, is not essentially a consumer transaction. *Id.* It presents a private dispute between competing corporations and few, if any, consumers are likely to be affected directly by its outcome. *Id.* 719 P.2d at 538.

Accordingly, TDS's motion for Rule 37 sanctions against PHAMIS [# 150] is GRANTED IN PART and DENIED IN PART. PHAMIS is ORDERED to comply with TDS's Requests to Produce No. 15 and 39 with regard to PA or Physician or Clinicians Access documents within thirty (30) days of the date of entry of this order. PHAMIS is ORDERED to pay the attorney's fees TDS incurred in bringing the motion. TDS is DIRECTED to file a short brief with supporting affidavits on the attorney's fees issue within thirty (30) days of the date of entry of this order. The motions for summary judgment asserted against TDS by PHAMIS [# 166] and Humana Illinois Inc. [# 160] are DENIED. TDS's motion for summary judgment against Humana Illinois [# 163] is GRANTED IN PART and DENIED IN PART. Counterclaim Defendants TDS, Childs, and Cattarina's motion for summary judgment against PHAMIS [# 153] is GRANTED.

SO ORDERED.